## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **MARY SARA,** : | |
| **Plaintiff,** : | **Civ. No.** |
| : | |
| **v.** : | |
| : | **JURY TRIAL DEMANDED** |
| **LCB SENIOR LIVING, INC. dba THE** : | |
| **RESIDENCE AT SELLECK'S WOODS,** : | |
| **VIRTUS/LCB DARIEN, LLC, and LCB** : | |
| **CONNECTICUT, LLC,** : | |
| : | **FEBRUARY 9, 2023** |
| **Defendants.** : | |
| : | |

## <u>COMPLAINT</u>

Plaintiff Mary Sara (hereinafter "Plaintiff") by and through her attorney Kirsten M. Schneider, of Carey & Associates, P.C., files this Complaint against the Defendants LCB Senior Living, LLC dba The Residence at Selleck's Woods, Virtus/LCB Darien, LLC, and LCB Connecticut, LLC (hereinafter "Defendants"). Plaintiff alleges as follows:

## I.  PRELIMINARY STATEMENT

1.  Plaintiff alleges claims for: (1) unlawful age discrimination (ADEA), (2) unlawful age discrimination (CFEPA), (3) retaliation, (4) breach of the covenant of good faith and fair dealing, (5) intentional infliction of emotional distress, (6) violation of the Americans with Disabilities Act (ADA), (7) Disability discrimination in violation of CFEPA C.S.G.A.§§46a-60(a)(1), (8) civil theft, (9) violation of Conn. Gen. Stat. § 31-51q, and (10) negligent infliction of emotional distress.

## II.  JURISDICTION, VENUE & PARTIES

2.  Plaintiff is a resident of the State of Connecticut, having her principal residence at Darien, CT.  Plaintiff is currently 67 years old.

3.      Defendant LCB Senior Living, LLC dba The Residence at Selleck's Woods maintains an office and operates an assisted living facility located at 1 Parklands Drive, Darien, CT, 06820 and maintains a corporate office located at 3 Edgewood Drive, Suite 101, Norwood, MA, 02062.

4.      Defendants LCB Senior Living, LLC, Virtus/LCB Darien, LLC, and LCB Connecticut, LLC maintain a corporate office located at 3 Edgewood Drive, Suite 101, Norwood, MA, 02062.

5.      The Defendants are operated as a single employer, having common ownership, common corporate legal counsel, common corporate human resource department, common email communication system, such that they are considered to operate as one employer.

6.      This action is authorized and instituted pursuant to 29 U.S.C. § 621, *et.seq.*, and pursuant to 28 U.S.C. Sec. 451, 1331 and 1343(3) and (4).  This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

7.      All of the allegations made herein occurred within the territorial jurisdiction of the United States District Court for the District of Connecticut.

**III.     PROCEDURAL PREREQUISITES**

8.      On April 14, 2022, Plaintiff filed a "dual charge" of discrimination against Defendant with the Boston Area Office of the Equal Employment Opportunity Commission (EEOC) and the Connecticut Commission on Human Rights and Opportunities (CHRO). A copy of the dual charge was sent to the Defendant on the same date.

9.      On December 15, 2023, Plaintiff received a Notice of Right to Sue letter from the EEOC regarding charge number 523-2022-02402. (Exhibit A).

10.     On February 2, 2023, Plaintiff received a Release of Jurisdiction from the CHRO regarding complaint number 2220287. (Exhibit B).

11.     All administrative prerequisites to the institution of this action have been satisfied.

**IV.     STATEMENT OF FACTS**

12.     Plaintiff was employed as a Registered Nurse at The Residence at Selleck's Woods in Darien, Connecticut. Her employment was terminated after: repeatedly complaining that the Selleck's facility was understaffed and more nurses needed to be hired; being forced to work overtime and be on call 24/7; complaining that the working environment was unsafe for nurses and that the residents' healthcare was at risk; after taking a short leave of absence because of her plantar fasciitis; after being hospitalized with pneumonia due to work stress; and after complaining that she was treated differently in the terms and conditions of her employment because of her age. Plaintiff was terminated after an unwarranted suspension for failing to destroy a medication that was contained in a locked desk drawer that was located in a locked office.  Plaintiff became the scapegoat for a harmless oversight (and the younger nurse involved was not disciplined and no other younger nurses had ever been disciplined for the same or similar oversight).  Plaintiff was discriminated against and terminated because of her age and in retaliation for consistently complaining that Defendants were violating the law by allowing the facility to be understaffed and staffed with less than qualified nurses. Defendant violated the ADA by refusing to provide Plaintiff accommodations for her plantar fasciitis and Defendant failed to return Plaintiff's personal property. Because of Defendants' extreme and outrageous conduct, including the hostile work environment created by Defendants, Plaintiff suffered and continues to suffer extreme emotional distress.

13.     Plaintiff is 67 years of age and is a highly respected and seasoned Registered Nurse.

14.     Plaintiff attended Norwalk Community College and received an Associate Degree in Nursing in 1979.

15.     Plaintiff has been employed as a Registered Nurse for the past 43 years. She worked full

time 30 of the 43 years and part time for 13 years. She has been employed as a hospital staff nurse, at a major university in the Psychiatric Clinic, as a Charge Nurse on an Acute Rehabilitation Unit, and worked as the Care Plan Coordinator for 120 residents. She has also worked as an Assistant Director of Nursing and as a Hospice Admissions/Case Manger Nurse. She had never received any disciplinary actions in the past 43 years before working for Defendants.

16.     In early 2021, after working as a hospice nurse for one-and-one half years, Plaintiff applied for a position at The Residence at Selleck's Wood, an assisted living facility in Darien, CT, housing, at that time, about 45 residents. After accepting her offer of employment, she learned she would be on call at various times. She could drive to the facility in 10 minutes from her home, and she enjoyed working as an Assistant Director of Nursing in the past and was planning to work at Selleck's Woods at least until age 70-73, at which time she planned on retiring.

17.     Plaintiff began working at Selleck's Woods on March 22-23, 2021. The onboarding, or initiation, consisted of a two-day general orientation for all new staff that was not specific to nurses. She was informed that she needed to read the general company policy manual on her own time to familiarize herself with all policies, which she did. She was never provided a manual or policy regarding safe nursing practices or protocols at Selleck's Woods Darien, CT facility, and she was never told that such a policy existed.

18.     Plaintiff was always qualified for her job. Plaintiff never received a negative performance review.

19.     Her job duties included all aspects of nursing and resident care including administering medications and creating Resident Care Plans (RCP) for residents. When she began her

employment in March 2021, Plaintiff was not given any formal instruction for how Selleck's Woods required the charting of medications for the computer system. It was not until July 2021 that Plaintiff attended a four (4) hour in-service session via Zoom to learn the YARDI computer program. This is the computer program used by the company for recording resident charting. Prior to this, she taught herself with the help from other staff nurses. She also received only an hour of in-person instruction with the Director of Nursing, Holly Francia-Kiss, age 51, regarding the necessary documentation of Nursing Care Plans. Holly related that she did not have any in-service instruction regarding Nursing Care Plans on YARDI, and that she had been able to, and required to, teach herself. Holly directed Plaintiff to do the same. Plaintiff found training herself about in-service instruction regarding Nursing Care Plans on YARDI very difficult and time consuming.  Plaintiff was not paid for the time she spent learning the YARDI program while she was learning it on her own time. Plaintiff worked at least 10 hours at home teaching herself the basics of inputting resident information. The onboarding was not thorough and lacked any direction. Selleck's Woods had no protocol or standard operating procedures. Plaintiff was basically on her own regarding learning the YARDI computer program and company procedures from March to late July of 2021. Finally, in late August 2021, Plaintiff was instructed by Bonnie H., RN, from the corporate offices, to attend the YARDI Zoom session on Resident Care Planning, which she did.

20.      If there was a manual or corporate guideline available for Safe Nursing Practices at Selleck's Woods, only Holly had access to it. Plaintiff was never given a copy.

21.      Bonnie Halligan, RN, was Holly Francia-Kiss' supervisor.  Holly also worked under the direction of Gale Mayeran, the Executive Director at Selleck's Woods.  Plaintiff's direct supervisor was Holly, but Bonnie also supervised her work and made decisions related to the

terms and conditions of her employment.  Holly supervised all the other nursing staff at Selleck's Woods. Gale was supervised by the Corporate Board.  Bonnie's supervisor was Mike Toce, the Corporate Sr. Director of Care.

22.     Bonnie is approximately 45 years of age. She visited Selleck's a total of three times from March 2021to October 2021. This was the only contact Plaintiff had with her. During each visit Bonnie asked if Plaintiff's Resident Care Plans were being completed on time. Plaintiff replied the same each time, that she was doing her best but frequently there was not enough time to care for the residents and complete Resident Care Plans due to the decrease in staffing and increased number of residents and urgent responsibility to meet their immediate needs. Plaintiff worked on completing Resident Care Plans once time allowed, and after caring for the residents' immediate needs.

23.     When Plaintiff started in March 2021, the Resident Care Plans were not up to date.  The facility was behind on 12 Resident Care Plans.  This was in violation of both corporate policy and the State of Connecticut Nursing Regulations. Plaintiff discussed her concerns about the noncompliance of RCPs with Bonnie the first time she asked about the status of the Resident Care Plans. Bonnie just told Plaintiff to make sure they were completed and disregarded Plaintiff's concerns.

24.     From March 2021 – July 2021, Plaintiff worked with a full-time LPN named Jennifer Velazquez. Jennifer would administer medications while Plaintiff was in the office handling phone calls and tending to residents' immediate needs and medical emergencies. It was very difficult for the LPN to administer medications to approximately 50 patients and handle the immediate needs of all residents. Plaintiff always placed the urgent resident needs before all else. It was Plaintiff's responsibility, as the Registered Nurse in the facility, to assess emergencies as

the Licensed Practical Nurse did not have advanced assessment skills.  The LPN was not able to

handle this responsibility the same way a Registered Nurse could, with her advanced training.

When the LPN was occupied administering medications and charting at those times, if she had to

handle emergencies, any emergency would put her behind schedule with medication

administration, which is not in compliance with the State of Connecticut Regulations.  The LPN

was not able to handle all of the responsibilities independently. This is why it was critical to have

the LPN administering medications only.  However, the first time Plaintiff met Bonnie, Bonnie

told Plaintiff that both medical emergencies and medication administration were the "LPN's

responsibility alone." It was at this time that Bonnie also told Plaintiff that she should just focus

on Resident Care Plans. It took time to do a thorough assessment of each resident to update their

Care Plans. The Care Plan process involved a thorough physical assessment, review of the

resident's medications and doctor's orders, as well as a review of all nursing notes before

beginning the Resident Care Plan for each resident. Done correctly, each new assessment would

entail at least two or more hours before the start of the charting, which entailed another two

hours. The completed Resident Care Plan also was to include time for conferencing with the

resident and their family members to approve the new Resident Care Plan. This usually took

another hour. Plaintiff explained all of this to Bonnie.

25.     In July 2021, after Jennifer Velazquez, LPN, resigned, Plaintiff's team had no regular day

nurses. Holly Francia Kiss, RN, DNS, (age 51) informed Plaintiff that no Registry (Agency)

nurses would be hired per Gale Mayeran, the Executive Director at Selleck's Woods.  Holly

asked Gale numerous times for help as Holly and Plaintiff were unable to do the work of four or

five nurses that were required. Plaintiff was virtually on her own and responsible for all nursing

responsibilities. No one was hired to permanently replace Jennifer. It was an impossible situation

to create and execute Resident Care Plans, administer medications to all patients, care for patients' needs, tend to medical emergencies, and answer phone calls, all in one daily shift.

26.     Plaintiff was also required to create the schedule for the nursing staff as this was included in her position's responsibilities.  Her scheduled workday was seven-and-one-half hours totaling 37.5 hours weekly. But nearly every day from May 2021 through the last day, she actively worked on October 21, 2021, Plaintiff rarely took a lunch break and walked over 12,000 steps per day. Plaintiff would also stay an hour or two extra every day to finish up required work. Plaintiff worked approximately 14 hours per day, excluding her on-call time. Plaintiff complained numerous times to her Director of Nursing, Holly, that the staffing ratio of nurses to residents was not being increased as the resident population increased to 65+ residents. This ratio of one RN or LPN to 25 residents may have been adequate, but one RN or LPN with 60-plus residents was not safe for the residents or the nurse. She agreed with Plaintiff's assessment of the nursing staffing problem.

27.     Plaintiff did not have access to corporate policy regarding patient to staff ratio, but she knew she was being overworked and did not have enough time during her shift to properly complete all the tasks assigned to her.  Only Holly had access to this company policy. Holly sent Bonnie a copy of the nursing schedule and Bonnie acknowledged the problem but offered no solutions. Bonnie ignored the understaffing issue, and Gale ignored the understaffing issue. Holly and Plaintiff were alone in an intolerable work environment which was not in compliance with Safe Nursing Practice.  Each request for additional nursing staff was a definite "NO" from Gale. Holly and Plaintiff had no support from Defendants' Executive Director, Gale, or from Bonnie, in the corporate office. Holly told Plaintiff that the corporate office would not increase staffing until the census reached 100 residents.  In addition to this normal day-to-day schedule, a

physician would visit the facility on a weekly basis. On those days, it was necessary for Plaintiff to accommodate a schedule including a half-day to meet with the physician and conference with the physician after he was done with his examinations and assist in the completion of all the orders he had written.

28.     On or about late July-early August 2021, Plaintiff approached Gale and asked about hiring agency nurses until more staff could be hired. Gale stated that "We (Holly and Plaintiff) would do what we had to do and that was the way it would be." This meant that Holly and Plaintiff would each have to fulfill their duties as Director of Nursing Services and RN Designee, respectively, combined with the full-time duties of floor nurses and medication administration. The medication distributed to the residents would take a solid nine hours. Plaintiff was required to administer all medications in the residents' apartments. At that time, Plaintiff was also on call for any emergencies when she was not at the facility. Plaintiff was required to be available to Selleck's 24 hours a day, 7 days a week. No matter how often Plaintiff reported the need for additional nursing staff, their requests were ignored.

29.     Plaintiff was on call every other week for a week at a time. It was understood that if Selleck's was short staffed the on-call nurse would cover the shift. Plaintiff frequently covered shifts when the scheduled nurse was out. If there was a medical or other resident emergency, Plaintiff would be notified by a Resident Care Assistant.  The RCAs are full-time employees and provide direct and indirect resident care, such as cleaning, moving residents, assists with personal care and feeding, and doing clerical duties. There was no licensed nursing staff from 8 pm to 7 am.  The Resident Care Assistant (RCA) would call either Plaintiff or Holly depending who was on call.

30.     When called by the RCA Plaintiff would assess the situation and, if necessary, either

come in or instruct the RCA to send the resident to the hospital for an assessment and treatment. Plaintiff would then have to complete all required charting and incident reports concerning any emergency which occurred from 8 pm to 7 am.  On average, medical emergencies occurred at least once a week during the hours of 8 pm to 7 am.

31.     Plaintiff complained to Bonnie that the job responsibility also required Plaintiff's time and attention which took away time to manage her other daily responsibilities. Plaintiff informed Bonnie of this situation the second time she visited.  Bonnie always repeated that this was the LPN's responsibility. But there was no full time LPN at Selleck's, so this task fell onto Plaintiff's duties. Even if there was a full time LPN, Plaintiff would not have the time to complete the required charting at 7 am.  To do so, Plaintiff would be out of compliance with the Medication Administration schedule. Bonnie was not helpful in offering any suggestions as to how to rectify the problems of understaffing, not being current with Resident Care Plans, and managing Plaintiff's additional daily responsibilities.  Plaintiff performed all her responsibilities within a reasonable period of time for the over-loaded work responsibilities given to her. Plaintiff was efficient with her time management, and she never took breaks.  But her workload only increased with the increase in the resident's census. However, since Plaintiff's termination, Selleck's has hired a full-time 7 pm to 8 am nurse.

32.     In July 2021, from 4-8 pm, Plaintiff was working with Holly.  During this shift, both nurses medicated the residents.  When medicine is administered to a resident, it is Selleck's policy that the nurse to use an IPad to log the patient's medications administered immediately after administering medications. Plaintiff had her IPad to record the medication administration as medications were administered and check to ensure she was administering the correct medications. Holly did not have her IPad as she was unable to log medications.  She

administered all medications without the IPad.  She later documented on her computer that she

had given all the prescribed medications at the correct times without the assistance of any

information from the IPad. This was a violation of company policy and an act that could be

potentially harmful to a resident. Holly (who is 51 years old and substantially younger than

Plaintiff) was <u>not</u> disciplined for this action. Plaintiff was treated differently than similarly

situated employees who are substantially younger than her.

33.     In August 2021, Plaintiff workload increased substantially because two nurses left to

work in other facilities. This left Holly and Plaintiff as the only full-time nurses in the facility.

The two exiting nurses told Plaintiff that they left because there were not enough nursing staff to

care for the residents and they felt that it was no longer a safe working environment because of

the unbalanced resident to nurse ratio. This left just the Director of Nursing, Holly, a per diem

LPN, and Plaintiff, to manage all of the resident's nursing needs. Plaintiff was told that she was

required to work more hours, including overtime in order to get this extra work done. Plaintiff

was not given a choice and was already working extra hours since Jennifer left. This was an

adverse employment action.

34.     Selleck's Woods corporate personnel suggested to Plaintiff that they would hire staff to

fill the vacancies, but they never did. Selleck's was left with a skeleton staff of just Holly and

Plaintiff, with only one occasional per diem LPN coming in to assist with patient care.

35.     Plaintiff complained repeatedly to Holly that she was overworked and that Selleck's was

understaffed. Each time Plaintiff was instructed to just deal with it and work longer hours.

Frequently, Plaintiff was unable to complete her assigned work within the time during her

regular work shift because she had to cover the workload of other staff members who had left

Selleck's and were not replaced with new staff.  When Selleck's did hire a nurse, she only stayed

one day and informed Holly and Plaintiff that she was not returning as it was "unsafe" to work

with the number of residents involved, and such a small number of staff.

36.     Sometimes, Plaintiff would be the <u>only</u> nurse in the building for medication

administration, emergencies, and all other nursing responsibilities related to the residents' care.

There were approximately 64 residents at Selleck's Woods in August 2021. Besides being

responsible for their care, Plaintiff would also be on call for emergencies and to give direction

and instruction to any Resident Care Assistants.  Plaintiff felt that she had no choice but to work

in any capacity needed as staffing was grossly inadequate. Management expected Plaintiff to

cover the shifts that were inadequately staffed. This placed Plaintiff's nursing license in jeopardy

because the lack of professional Nursing staff created an unsafe environment for the residents.

37.     On many occasions, since the second week in July 2021, Plaintiff repeatedly voiced to

Holly and Gale that working these long hours were causing her increased stress and anxiety, and

physical pain in her feet. Plaintiff repeatedly requested that Selleck's hire agency nurses or a full-

time facility nurse to relieve the workload. Each time Plaintiff made this request, it was denied,

and she was told to "deal with it."

38.     During the second week of August 2021, Holly was finally able to speak Michael Toce,

in the corporate offices, about the nursing staff shortage. Michael told Holly that agency nurses

should be hired. Michael also notified Gale, whose reply was "of course they would be hired."

Holly and Plaintiff could not believe Gale's response to Michael. Despite Michael's instruction,

Gale was talking out of both sides of her mouth.  To Michael, her superior, she was agreeing to

hire more nursing staff, but to Plaintiff, her message was clear that she would not hire more

nursing staff. Up until this time Gale forbid the nurses to make any requests to hire Agency

Nurses. (Agency Nurses work as temporary staff, if an assisted care facility needs more nursing

staff.) Gale continued to inform Plaintiff and Holly that they "could handle the problem ourselves" and that "agency nurses would not be used."

39.     Being overworked by Defendant also caused Plaintiff to have physical problems. In July/August 2021, Plaintiff begin to have extreme pain in her feet and lower legs. Selleck's Woods dress code states that all staff must wear dress shoes. Nurses were not permitted to wear supportive footwear such as sneakers. On or about July 2021, Plaintiff asked Holly if she could wear different shoes that provided more support and comfort, to ease her pain in her feet, and they denied her request for accommodation.

40.     In late August 2021-mid September 2021, Plaintiff was diagnosed with plantar fasciitis in her right foot because Defendant required to being on her feet continuously for up to12 hours or more daily and being required to wear dress shoes instead of comfortable, supportive shoes. This requirement limited Plaintiff's ambulation and caused her extreme pain.

41.     During the first week of September 2021, Plaintiff was having extreme pain in her feet, especially her right foot. Her feet were always swollen. Plaintiff spoke to her supervisor, Holly, and Plaintiff sent Holly a photo of her edematous feet. This condition resulted in Plaintiff having to go to the Stamford Hospital's Emergency Room the first week in September 2021. She went to the Stamford Hospital Emergency room because she was not able to walk without severe pain. She had tried for months to overcome the growing discomfort and pain, and continue to work, but finally could not tolerate the excruciating pain any longer. Plaintiff notified Holly of her extreme foot and leg pain and Holly agreed with Plaintiff's decision to seek emergent treatment. Plaintiff followed up with the Podiatrist a few days later, who confirmed the diagnosis of plantar fasciitis of her right foot. Plaintiff never had plantar fasciitis before working at Selleck's.

42.     After going to the ER for the pain in her right foot, Plaintiff received follow up treatment,

including several cortisone shots over a few weeks' time, by her Podiatrist. For several days after her ER visit, she was unable to walk on her right foot.

43.     On or about September 10, 2021, Plaintiff notified Holly that she needed to take another few days off of work to help with the healing process for her feet because of her plantar fasciitis. Holly agreed that it was impossible for Plaintiff to work with this injury and diagnosis. Plaintiff was absent from work due to her plantar fasciitis from September 10-14, 2021. Plaintiff utilized her accrued PTO (Personal Time Off) for the days she was unable to work. In Plaintiff's absence, Holly became responsible for all the nursing needs at Selleck's Woods. Holly requested that additional nursing staff be hired to support her. She made the request to Selleck's management staff, Michael Toce, and he agreed to hire Agency Nurses, as Holly was the only full-time nurse. However, prior to this, when Plaintiff requested additional support, there was a complete lack of support from Selleck's management to provide critically needed additional nursing staff. On the several occasions when Plaintiff complained to Gale that more nursing staff was needed, and requested that agency nurses be hired, Gale denied the request. Plaintiff was treated differently than Holly who is substantially younger than her.

44.     On September 5, 2021, while Plaintiff actively had plantar fasciitis, and before it was diagnosed, Plaintiff was requested to prepare all medications for a resident who was going to be away over Labor Day weekend. The resident would take these medications with her. Plaintiff prepared the medications according to the list of medications for the resident, and the medications directions. The medications were kept in a locked medication cabinet. The list of medications was ordered by the physician and entered into the computer system. On information and belief, it was Holly's responsibility to make sure that all the medications ordered by the physician were placed in the locked cabinet for the resident. On occasion, Holly would assign

14

this task to an agency nurse as well. Plaintiff removed all the medications in the cabinet to ensure

that the patient's travel pack was complete. Plaintiff did not overlook any medications.

Approximately two weeks later, Holly, the Director of Nursing, notified Plaintiff that the

patient's family had told her that one medication was missing from the pack Plaintiff prepared

for the patient's weekend away. The missing medication was not in the cabinet and not on the list

of medications to include in the travel pack. Holly was kind when she spoke to Plaintiff and

acknowledged that Plaintiff was in a great deal of pain and overworked at the time.  Holly told

Plaintiff that the corporate management team did not want her to be written up or disciplined for

this event.

45.     Corporate directed Holly to review the Medication Administration Policy for the

preparation of medications for residents who would be going on Leave of Absence from the

facility with Plaintiff. Holly handed Plaintiff the Medication Administration Policy to review on

her own, because she did not have time to sit with Plaintiff and review it together. Plaintiff

reviewed the section of the Orientation Guide as Holly directed. Before this, Plaintiff did not

have access to the Medication Administration Policy. She had never been provided this Policy

prior to that date.

46.     Plaintiff had followed the proper proceeding related to this resident's weekend-away

medications or "go-pack." This was the only corrective action that Defendants required of

Plaintiff to ensure she was educated further about medication preparation in general. Plaintiff

was not given a written warning and no further disciplinary action was taken. A week later,

Plaintiff was notified by Holly that the corporate nurses, Bonnie Halligan, RN, and Debra Reitz,

RN (50 years old), requested that the corporate office take further action against Plaintiff. The

corporate office denied their request and no further action was taken. Holly was also not

disciplined for her role in the medication oversight. The matter had been resolved per the corporate office. They never told Plaintiff who in the corporate office denied the request, Holly would always just refer to them as "corporate."

47.     Plaintiff felt that Bonnie and Debra did not like her and wanted her to be terminated at this time. The fact that Bonnie and Debra wanted her disciplined for something she did not do caused her an extraordinary amount of worry. She did her job properly and Bonnie and Debra would not let it go. Plaintiff felt she was treated differently by Bonnie and Debra because of her age and because of her frequent requests for more nursing staff. Holly also related that Michael Toce, RN Supervisor of Bonnie and Debra, at the corporate office, said that this did not warrant a written warning and that no further action was necessary. Plaintiff knew that when she prepared the medication pack for this patient's Labor Day weekend trip, that after preparing the go-pack, the medication cabinet was empty. Meaning that Plaintiff had included all the necessary medications for the resident. However, Plaintiff was made to feel that she had missed a blister pack.  The missing blister pack in question was definitely not there when she got the medications ready for the resident's trip. The blister pack was not in the locked cabinet when Plaintiff prepared the medications.  Plaintiff felt that Bonnie and Debra were accusing her of lying, or worse yet, being negligent.  This false accusation and surrounding harassment caused Plaintiff extreme stress and anxiety. This was a hostile act.

48.     Approximately mid-September 2021, a new patient was admitted to the assisted living facility, transferring from another assisted care facility. She arrived at Selleck's Woods with a blister pack of medication that was not her medication. A blister pack (medication prepackaged by dose and date) was mistakenly sent with her by the other care facility. The transfer of incorrect medications happens frequently in Plaintiff's industry and Selleck's Woods had no

protocol regarding management of medications sent in error.

49.     Therefore, Plaintiff called the Assistant Director of Nursing at the transferring facility to report this error. She advised, and Plaintiff agreed, that Plaintiff should destroy the medication with the Director of Nursing Staff, Holly, and then send a record of the medication destruction document to her. Plaintiff informed the Assistant Director that this would be done. Destruction of medication requires two nurses to be present and take part in the destruction of medication. Plaintiff notified Holly of this situation and attempted to facilitate the speedy resolution of this matter. However, each time an attempt was made to accomplish this, Plaintiff was either called to an emergency, or she was dealing with families and residents, administering medications, out of the facility with physical illnesses, or Holly was unavailable. Both Plaintiff and Holly were extremely overworked and overtasked in their job responsibilities. It is required pursuant to Connecticut State Law that when this situation occurs (the incorrect medications are transferred with a resident and therefore the medication must be destroyed), there must be an additional witness to the destruction of the medication. So, both Holly and Plaintiff had to be present when the medication was destroyed.

50.     All new medications ready to be delivered to the residents were kept in bags stored on the top of the desk in the locked Wellness (Nursing) office until delivery to the residents. They were not locked up. This is the same office where Plaintiff's desk was located. This was the policy that was in place at the Selleck's facility when Plaintiff began working there in March 2021. The Wellness office (nursing office) door is always locked. It is only open when the nursing staff is present.

51.     Unfortunately, on September 20, 2021, Plaintiff became very sick from exhaustion and had a horrible head and chest cold. Plaintiff had just been working too many hours, she was

struggling with plantar fasciitis, and she had become sick from the exhaustive schedule at work. On September 20, 2021, Plaintiff's head and chest cold had become so severe that she was having a hard time catching her breath. Plaintiff was worried about her sickness and labored breathing, so she went to the emergency room. After several tests, Plaintiff was admitted to the hospital with pneumonia. Plaintiff contacted Holly at Selleck's Woods to let her know she was in the hospital with pneumonia and that she would not be in to work until she was discharged from the hospital.  She was hospitalized for eight days. Plaintiff was told by her doctor that her pneumonia was caused by exhaustion, physical stress, and mental stress and anxiety caused by her work environment. Plaintiff notified Holly and Selleck's that her pneumonia was caused by her work stress. Selleck's did not support Plaintiff in her stressful work environment, despite her consistent requests for additional nursing staff and now Plaintiff was experiencing the physical symptoms of her ongoing hostile and stressful work environment. The work demand and stress of being overworked at Selleck's had made Plaintiff physically ill.

52.     Danielle Marques, Senior Business Office Director at Selleck's Woods contacted Plaintiff while she was in the hospital. She told Plaintiff that Plaintiff needed to take a leave of absence if she could not fulfill her duties as an RN designee. Plaintiff took a personal leave of absence because she was told that she was not eligible for FMLA leave or workers compensation to heal from her serious medical condition (pneumonia). Instead, Plaintiff used 25.5 hours of her sick leave and accrued vacation time. This was very distressing because the brutal work environment and outrageous demands at work had caused Plaintiff to become sick. Plaintiff did not inquire further about workman's compensation because she was instructed to take a personal leave of absence and that worker's compensation did not apply to her. Plaintiff was made to feel that her illness was her fault. Plaintiff felt that they did not want her to return to the facility. Plaintiff has

never been so ill from work before that she had to be hospitalized. Plaintiff became severely ill because she was outrageously overworked and was suffering in a hostile work environment. Being required to work overtime shifts and be on call at home when Plaintiff was "not at work," caused her exhaustion, illness and eventually pneumonia that required her to be hospitalized in order to heal. She stayed at home for approximately another seven days, after her discharge from the hospital, until she completed her oral antibiotic therapy.

53.     On October 6, 2021, Plaintiff returned to work. When she arrived at her office, she noticed that the blister pack was still in the locked drawer of her desk. Plaintiff was surprised that the bister pack had not been destroyed while she was out on leave. Agency nurses and Holly covered for her in her absence.  Once Plaintiff discovered the blister pack was still there, she intended to take care of its destruction with Holly, as soon as possible.

54.     On October 6, 2021, Holly asked Plaintiff to write an incident report and supply a written statement to the corporate office regarding (he "omission of medication" event that had occurred on September 2021 related to the patient who left the facility during Labor Day). Plaintiff was stunned because she had been told that the incident was resolved. Plaintiff felt that Bonnie H. and Debra from corporate were involved. According to Holly, Mike Toce related that no further action would be taken regarding this event but now Bonnie and Debra had instructed Holly to make Plaintiff submit a statement. This made Plaintiff uncomfortable and exacerbated her stress and anxiety. The matter had been resolved at the corporate level by Michael Toce, RN, Regional Director. He had determined it was not a matter to consider disciplinary action against Plaintiff. Now Bonnie and Debra were requesting that the matter be revisited. This was a hostile act. This was an adverse employment action.

55.     From October 11-16, 2021, Holly was on vacation.  Nurses from the Agency were

assisting in the resident's care. Plaintiff could only destroy the medication with Holly as she was the only person who had access to the needed Destruction Forms.

56.     Each morning when Plaintiff came to work, she did the same thing with the blister pack that needed to be destroyed. The desk was located in the Wellness office that is locked at all times. Holly knew how Plaintiff was managing this medication and never instructed her to do anything differently. Plaintiff would take the blister pack out of her locked drawer, set it on her desk to remind her that it needed to be destroyed. This was typically how Holly and Plaintiff would manage medications that needed to be destroyed. Plaintiff was so overwhelmed and overtasked at work that she did not have a moment to  destroy the medication, and neither did Holly. And since Plaintiff needed another nurse and the appropriate Drug Disposition Forms to witness its destruction, it had not been destroyed because Holly and Plaintiff were just so busy.

57.     Most medications at Selleck's are kept out in the open.  Plaintiff was taking extra precaution with this blister pack by locking it in her desk drawer because it was supposed to be destroyed. In fact, all medications that are delivered to Selleck's, and those being returned to the pharmacy (Connecticut Pharmacy in Norwalk), are kept out in the open. This was a Selleck's policy that Plaintiff was made aware of when she started working at Selleck's.

58.     On October 20, 2021, and for three days, two nurses from the corporate office, Bonnie and Debbie, were present in the Selleck's Woods facility. They were at the facility because Selleck's Woods was still grossly understaffed and they were there to audit the nurses' work. On the second day, October 21, 2021, Plaintiff was summoned to the staff meeting area in the building's front office by Gale, Holly, and the two corporate nurses. Plaintiff was asked by Gale, "Who requested two agency nurses from Sterling Care Nursing Agency for each shift instead or one?" Plaintiff answered that it was Peter, an RN (agency nurse) from Sterling Care, who

requested it from his Agency because he said it was unsafe for only one nurse to perform the tasks required on both the 7AM-3PM shifts and the 3PM-8AM Shifts. Plaintiff agreed with the request, but had no part in making the request from the Agency for two nurses per shift. On information and belief, Sterling Care Nursing Agency Services, made this demand because it was concerned for the safety of its agency nurses while working at Selleck's facility.

59.     Plaintiff was told by the Sterling Care Nursing Agency's Supervisor, Ricki, that the nurses felt unsafe being alone in the building administering medication to such a large population and the Agency Nurses were fearful of making a mistake due to the large number patients who needed to be seen. At that time, Plaintiff believed that Selleck's had 64 or so residents and each person's medications had to be administered in a two-hour window, while the nurse was also responsible to tend to all other duties and emergent response care. Plaintiff agreed with the Agency nurses' assessment of an unsafe working environment for one nurse for the facility. Then Bonnie and Debbie questioned Plaintiff regarding the need for two nurses. Plaintiff stated that she felt that two nurses were necessary, in addition to Plaintiff, for the safe operation of the facility. Connecticut State law also requires that the nurse must witness a resident, for whom medication has been prescribed and delivered, not only take the medication, but swallow it in his/her presence. That is one reason why distribution of medications is very time-consuming. From Bonnie and Debbie's facial expressions and mannerisms, Plaintiff could tell that they were not happy with her for wanting more nursing staff at Selleck's Woods.

60.     During this October 21, 2021, meeting with Bonnie and Debra, Plaintiff complained about the understaffing of qualified nurses. It was Plaintiff and Agency Nurses who cared for the residents during the day and one part time facility nurse who came in from 4 – 8pm for 2 shifts a week. Resident Care Plans were completed during this time. Instead of offering to assist

Plaintiff, they cleaned the supply cabinets and talked between themselves. Plaintiff found this demeaning and disruptive. Plaintiff had work to complete, and she complained again to Bonnie that they were understaffed for the number of patients they were caring for. Bonnie, again, had nothing constructive to offer: She just reiterated that Plaintiff had to complete the work. This was not at all helpful in remedying the situation and only increased Plaintiff 's stress and anxiety levels. Bonnie was not helpful with our nursing staffing shortages at this time either. There was never any mention of increasing the licensed nursing staff. Bonnie continued to disregard Plaintiff's concerns and complaints.

61.     Also, on October 21, 2021, while Bonnie and Debra were in the facility again. This is the same day that Plaintiff took the blister pack of medication that had been erroneously delivered to Selleck's Woods and placed it on her desk at work to be destroyed later that day when Holly was available. Plaintiff's desk was located in an office that was always locked and needed a key to enter. Only the nursing staff and administration had a key to Plaintiff's office. Plaintiff intended to destroy the medication, with Holly, once Plaintiff was finished managing emergent situations throughout the facility. Being so egregiously short staffed, after Plaintiff's emergent care duties, she was required to work overtime to cover medication rounds, so she could not take the time, at that immediate moment, to destroy the medicine with Holly. Holly also knew the medication was on Plaintiff's desk and that it needed to be destroyed. Bonnie and Debra did not offer to assist in the destruction of the meds while they were in the facility.

62.     Plaintiff did not destroy the medicine on October 21, 2021, nor did Holly. They were both too busy managing other nursing matters within the facility that took priority to assure proper patient care. At the end or Plaintiff's shift, the medication was placed back in Plaintiff's desk drawer, which she then locked. When Plaintiff got to work the next day, she placed the

medication on her desk again to remind her to destroy it, when time allowed. Again, neither Holly nor Plaintiff ever had the opportunity to destroy the medicine. The blister pack was left on the top of Plaintiff's desk, in the locked office. It was a common practice at Selleck's to leave medications out, unlocked, in the locked office space.

63.     On Friday, October 22, 2021, Plaintiff received a telephone call, at home, from Gale and Holly. They told Plaintiff that on October 22, 2021, a blister pack of medication from another facility was found on the top of Plaintiff's desk. They accused Plaintiff of failing to lock the blister pack of medication in her desk drawer before she left on October 21, 2021.  Plaintiff disagreed with them and told them that she placed it in her desk drawer which was always locked. If the blister pack of medication was left on top of her desk, apparently, Holly failed to lock it up as well.  Gale said that "other nursing staff" found the medication left out. They did not tell Plaintiff who found it or why they gave unauthorized persons access to Plaintiff's office when she had been out of the office for medical reasons. Later, Holly told Plaintiff that it was Debra who discovered the medication on the desk.  Both Gale and Holly asked Plaintiff if she was aware of that the medication was left out. Plaintiff shared that she left it out during the day, on top of her desk, in the locked office, and that Holly and she had been planning to destroy it; but there were multiple emergent situations that came up that prevented this from being done. Plaintiff also told Gale and Holly that she had returned it to her locked desk drawer the day before at the end of her shift. Plaintiff felt that she was being set up by Debra.

64.     During this same October 22, 2021, meeting, Gale and Holly asked if was aware that the blister pack contained the medication Tramadol (which is a controlled substance). Plaintiff stated she was not aware of the name of the medication. Plaintiff observed that the medication was for a person not at our facility and that it was not our new resident's medication. Plaintiff also

observed that the blister pack was sent from the new resident's previous nursing facility. Plaintiff told Gale and Holly that she placed the blister pack or medication on the left-hand corner of her desk with the intention of destroying it with Holly and sending verification to the other nursing facility. It was kept locked in Plaintiff's desk drawer every single night.

65.     During this same October 22, 2021, meeting, Gale informed Plaintiff that her employment was being suspended without pay for an indefinite period of time.

66.     This was an adverse employment action. The destruction and security of the medication was also Holly's responsibility. Holly was not suspended or disciplined for the same conduct. Plaintiff was also informed that the matter had to be fully investigated. At that point, Plaintiff was not informed about how the medication was found or who found it. Plaintiff was told it was out in the open on her desk when it was found. Plaintiff was asked to write a statement as to what had happened. At this meeting, Plaintiff felt that she was not given the opportunity to explain the situation to Gale or question why Holly, who knew that she and Plaintiff were working together to find an opportunity to destroy the medication, was also not disciplined. After Plaintiff was notified about her suspension without pay, she attempted to call Holly for more information regarding the times frame for her suspension and a return-to-work date.  Holly did not respond.

67.     Plaintiff kept written reminders and information logged in her personal appointment book which was always locked in her office drawer. On October 21, 2021, Plaintiff requested that the appointment book be sent to her along with her personal belongings. Defendant refused and kept her personal appointment book and numerous personal items. Plaintiff called Holly numerous times after her suspension to request information related to the blister pack medication and to reclaim her personal property.  Holly never replied to any of her calls.

68.     Plaintiff was suspended in retaliation for complaining about a hostile work environment,

complaining that Selleck's Woods was understaffed, complaining that the work environment was unsafe because of being understaffed, complaining about working forced overtime and being on-call 24/7. This was also retaliatory for Plaintiff taking a leave of absence for her medical problems and requesting a medical accommodation for her plantar fasciitis (to wear sneakers instead of loafers).

69.     Plaintiff also believes that Bonnie was questioning her ability to complete the Care Plans due to her age. Bonnie made statements to Plaintiff directly, that other nurses (who were younger than Plaintiff) were able to complete the Resident Care Plans on time. Bonnie was overly critical of Plaintiff's time management and ability to complete tasks even though the patient population grew from 45+ to 65+ residents, and Selleck's Woods nursing staff shrunk. Bonnie was not this critical of the younger staff like Holly.  Plaintiff felt that the purpose for Bonnie and Debra's visits were to criticize her and harass her because of her age, and not supervise Plaintiff or offer the support necessary to bring the Care Plans up to date. Bonnie and Debra were present at the facility the day Plaintiff was suspended.

70.     Plaintiff was discriminated against because of and substantially in part because of her age. Holly, who is substantially younger than Plaintiff, was not disciplined at all for failing to destroy the medication and leaving it out on a desk or for having administered medications without the IPad.  Holly was fully aware of the blister pack that needed to be destroyed and that it was locked in Plaintiff's desk; but had done nothing about that when Plaintiff was in the hospital or out on medical leave. Holly had a duty to oversee this process and failed. However, Holly was not disciplined.

71.     In early November 2021, Plaintiff submitted a written objection to her disciplinary action. Plaintiff valued her job and she requested to be reinstated. Plaintiff had no intention of ending

her employment with Selleck's Woods. Plaintiff's request for reinstatement was denied. Plaintiff was hoping to work there for many more years before retiring after age 70-73.

72.    Due to Plaintiff's age, it may be impossible to find gainful employment moving forward.

73.    Plaintiff was treated differently than similarly situated employees because of and substantially in part because of her age. There have been numerous mistakes made regarding medications administered by younger nursing staff over time. Graver mistakes than leaving a blister pack in a locked desk drawer for a few weeks. These mistakes include failing to give patients their medications, giving the wrong dose, giving medications at the incorrect time, and failing to record the medications using the IPad. A record of all medications administered or omitted due to nurse error is available on YARDI. YARDI records the exact medications given and the times they were administered by the nurse. There are numerous gaps in the medication profile for each resident recorded on YARDI medication records. In Plaintiff's time at Selleck's Woods, not one other nurse was disciplined for their medication distribution errors. On information and belief, these nurses are all substantially younger than Plaintiff. Plaintiff was the only nurse who was singled out with subsequent disciplinary action. Plaintiff was treated differently because of her age.

74.    On several occasions during Plaintiff's employment at Selleck's, Selleck's employees who are substantially younger than her, and do not have medical disabilities, have made medication mistakes and were not disciplined for their actions; or if they were disciplined, the discipline was less severe than an indefinite suspension without pay and termination. As an example, Jennifer Velazquez, LPN, age 35, routinely left medications in resident's rooms and did not observe them take it. Some of these patients have mild dementia. Plaintiff found many medications left in various rooms, and patients that did not take their medications. These

residents required that medication administration be done by the nurse and both state and company policy required the nurse observe the residents take their medications. The nurse was to stay with the medication until it was administered successfully (swallowed). Plaintiff informed the Director of Nursing, Holly, of this behavior by Jennifer. Holly spoke with Jennifer, as did Plaintiff, regarding this matter. Her behavior did not change. Jennifer on several occasions just left the medications with the resident. It happened that she was a good friend of Gale's, the Medical Director. Jennifer was not disciplined, suspended or terminated, for her multiple incidents of medication mismanagement and resident care.

75.     In early October 2021, another nurse, Diane, LPN, age 40, who worked at Selleck's Woods sister community in Stamford, CT, also worked per diem at Selleck's Woods in Darien. Diane directed our new employee, a LPN, to "Just leave the medication in the resident's rooms and leave or you will never finish giving out the medications!" Diane changed our nursing administration sheet to indicate which residents to "Just leave the medications." This incident was brought to Plaintiff's attention by Bonnie who happened to enter a resident's room where she found a medication dosing cup with medications not taken by the resident. Plaintiff showed Bonnie the original medication instruction guide, and informed Bonnie that Diane was not disciplined for her violation of corporate policy and mismanagement of medications.  This was a safety issue for the residents and her unsafe behaviors were not disciplined.  Irana M., RN, an agency Nurse from Sterling Care was witness to this event.

76.     In that same situation, in early October 2021, Bonnie approached Plaintiff and asked her the following: "Is this how you teach others to administer medications?"  She was referring to the erroneous Nursing Medication Guide that had been wrongly updated by Diane, LPN. Plaintiff kept a copy of Diane, LPN's newly revised Nursing Medication instruction guide. It was

in Plaintiff 's desk drawer. On information and belief, Diane was not disciplined for updating the

Master Medication Guide with incorrect information, but Plaintiff got scolded for following the

improper information in the Guide. Plaintiff felt that Bonnie was singling her out to find a reason

to discipline her at that time. Plaintiff had nothing to do with Diane's actions regarding

medication administration or updating the Guide. The new LPN employee was told about the

incorrect medication education she was given, and then she resigned the next day. She told

Plaintiff that she resigned because she felt Selleck's Woods was an unsafe working environment.

She stated that 65 plus residents were more than one nurse could safely manage. The Sterling

Care Agency nurses also verbalized the same concern regarding nurse to resident ratio at

Selleck's Woods after being in the facility. The Sterling Care Agency nurses related to their

Supervisor, Ricki, that they would no longer come to Selleck's Woods unless there were two

nurses there at all times. Sterling Care began to send two nurses for each shift covered due to the

number of residents and nursing care involved.

77.     After Plaintiff's suspension without pay on October 22, 2021, her depression, anxiety and

stress related to work became so severe that she sought medical attention. Plaintiff had been

suffering from extreme stress and mental anguish while she was working at Selleck's Woods,

causing her to become ill with pneumonia, but now her symptoms skyrocketed. It was

overwhelming to realize that Selleck's Woods was discriminating against Plaintiff because of her

age and medical ailments and treating her so unfairly. Plaintiff's depression and hopelessness

became so overwhelming it was hard to get out of bed or do normal daily activities.  Plaintiff no

longer enjoyed time with her family.  She no longer went out to run errands with her family.

Plaintiff became extremely sad.

78.     On November 2, 2021, Plaintiff saw Dr. Bart Sloan, a psychiatrist, who ordered that she

take a medical leave from her job until her symptoms resolved. Dr. Sloan wrote Plaintiff a letter that she forwarded to Gale and Holly on November 3, 2021, letting them know that Plaintiff was required to take an immediate leave of absence to tend to her mental health and heal physically.

79.     On December 9, 2021, Plaintiff received a letter from Selleck's Woods stating that she was terminated immediately due to "reasons stated on [her] corrective action form." It stated that Plaintiff "did not follow Company Policy." It was never explained what specific policy was violated, or why she was terminated. Neither Holly, nor Gale or Bonnie, ever requested to speak with Plaintiff or explain what she had done. The reasons stated on Plaintiff's corrective action form were false and created in retaliation against her for complaining about age and disability discrimination, and in retaliation for complaining about Selleck's Woods violations of law regarding understaffing its facility and forcing her to work extraordinary amounts of overtime to cover for the nursing shifts that Selleck's Woods refused to fill. This was an adverse employment action.

80.     On or about December 2021, Plaintiff learned that Selleck's was still understaffed, and a severe medication mistake was made that went undisciplined. The nurse who made the medication mistake was substantially younger than Plaintiff, approximately 40 years old. Plaintiff learned from Irana M., RN, an Agency Nurse from Sterling Care, that after Plaintiff's termination, a Selleck's Woods resident returned from the hospital with a doctor's order to fill an antibiotic medication prescription. The facility nurse did not order the medication for five days. Also, this resident's physician was not notified that the resident had returned to the facility until several days have passed. On information and belief, these dangerous oversights by the nursing staff went undisciplined. Plaintiff was discriminated against because of her age.

81.     Also in December 2021, Irana M, an agency nurse from Sterling Care, also told Plaintiff

that Sterling Care nurses felt overwhelmed when working at Selleck's and many of the nurses did not want to return to the Selleck's Woods facility due to its being "an unsafe environment."

82.     Selleck's has committed civil larceny of Plaintiff's personal property. Selleck's took and withheld, with the intent to deprive, her personal property. When Plaintiff was terminated, Selleck's refused to let her come to the facility and collect her personal property.  Instead, Selleck's said it would send Plaintiff her personal property.  On December 14, 2021, Plaintiff sent Selleck's an itemized list of the personal property to return. The list included: 1) black Littman stethoscope (cost $300.00), 2) mini silver refrigerator, 3) all personal items in her 3 desk drawers (this included her personal journal/daybook), 4) all the filing containers on her desk, 5) her functioning pulse oximeter, 6) a lamp, and 7) her functioning manual blood pressure cuff. On December 27, 2021, Plaintiff only received part of the items she requested. Her brand new refrigerator was returned to Plaintiff broken. The items that Selleck's took from Plaintiff, and intentionally withheld are: the filing containers on her desk, her personal date book, functioning manual blood pressure cuff, pulse oximeter, various notes she wrote as reminders to complete projects, table lamp, and various notes she made concerning staff actions – such as the Nursing Medication Administration Instruction Sheet. Selleck's is knowingly depriving Plaintiff of her property. Plaintiff contacted Selleck's on several occasions regarding the return of her personal property and her damaged refrigerator, but Selleck's failed to respond.

83.     In late December 2021, Plaintiff ran into acquaintance in the grocery store. She expressed her sorrow that Plaintiff had to be terminated because of giving the wrong medication to a patient. Plaintiff was shocked!  Plaintiff told her that was a false statement and asked who told her this lie?  She stated that she heard the rumor from either the Dir. of Recreation at Selleck's or the Director of the Dementia Unit, she wasn't sure, but stated that "everyone knew about it."

Never in Plaintiff's professional life has she given a patient the incorrect medication. This was a defamatory statement that placed Plaintiff in a false light.

84.    Since Plaintiff's termination, the Executive Director, Gale Mayeran, was terminated and the Director of Nursing, Holly Francia Kiss, RN, resigned.

85.    As a result of the hostile work environment, Plaintiff suffered and continue to suffer severe and extreme emotional distress, anxiety, depression, sickness and physical ailments related to the intentional emotional distress inflicted on her by Selleck's and specifically Bonnie, Gale and Holly. While working at Selleck's, Plaintiff became physically ill with pneumonia and had to be hospitalized.  Plaintiff was constantly stressed and over worked to the point that her blood pressure and heart rate were irregular and dangerously high. Since, her termination, Plaintiff has suffered sleeplessness, depression, pneumonia, heart issues, high blood pressure and increased anxiety. Plaintiff has been hospitalized three times since her termination due to life threatening physical ailments related to the depression, stress and anxiety that was caused by Selleck's. Her medical conditions are ongoing. Plaintiff's work-related stress and anxiety only exacerbated her health conditions and prolonged her suffering while she was trying to gain her health back. Plaintiff has continued to be treated by Dr. Sloan for her depression and anxiety and by her general doctor for her physical related symptoms.

86.    Shortly after her termination, Plaintiff was replaced with a substantially younger nurse that is less experienced than her. Plaintiff was discriminated against because of and substantially in part because of her age.

87.    Plaintiff was discriminated against in the terms and conditions of her employment because of her age and disability. Plaintiff was treated differently that similarly situated employees who are substantially younger than her. Plaintiff was retaliated against for

complaining about age and disability discrimination. Plaintiff suffered adverse employment actions including a suspension without pay and later terminated because she complained about age and disability discrimination and because she reported a violation or suspected violation of the law by Selleck's that effects the public interest and safety. Plaintiff's complaints and retaliatory adverse employment actions were close in time. Plaintiff suffered a hostile work environment and suffered, and she is still suffering, from extreme emotional distress.

## V.    COUNT ONE:         AGE DISCRIMINATION PURSUANT TO THE
                           AGE DISCRIMINATION IN EMPLOYMENT ACT (ADEA)

88.    The allegations of paragraphs 1-87 are incorporated herein by reference as if fully pleaded herein in Count One.

89.    Plaintiff, age 66 on the date of termination, was/is at all relevant times in question a highly qualified and respected employee of the Defendant, pursuant to the Age Discrimination in Employment Act (ADEA).

90.    Plaintiff was subjected to a series of continuous adverse employment actions as described herein, including denial of medical accommodations, required overtime, unwarranted performance warnings, suspension without pay, and her termination, all taken because of (but for) her age.

91.    Plaintiff was always qualified for her role and was an excellent employee who performed her job duties pursuant to known internal policies and Connecticut State rules and regulations for nurses. Plaintiff made no known medication errors. Plaintiff always dispensed residents' medications properly. Plaintiff achieved all work goals given to her by her supervisors.  Plaintiff was terminated because of her age on December 9, 2021.

92.    On the many occasions that Plaintiff complained of her unlawful treatment, Defendant never provided a reason for its adverse employment actions.

93.    Upon Plaintiff's termination, Defendant never provided which "policy" Plaintiff violated, nor did it give her a specific reason for its unlawful treatment and termination of Plaintiff. Any reason Defendant now presents for the adverse actions are clearly pretextual and false.

94.    Plaintiff was denied equal treatment in the terms, conditions and privileges of her employment but for her age.

95.    Defendant should be held liable for discriminating against Plaintiff on account of her age, in violation of the ADEA.

**VI.    COUNT TWO:    AGE DISCRIMINATION PURSUANT TO CONNECTICUT'S FAIR EMPLOYMENT PRACTICES ACT (CFEPA).**

96.    The allegations of paragraphs 1-95 are incorporated herein by reference as if fully pleaded herein in Count Two.

97.    Plaintiff, age 66 on the date of termination, was/is at all relevant times in question a highly qualified and respected employee of the Defendant, pursuant to Connecticut's Fair Employment Practices Act (CFEPA).

98.    Plaintiff was subjected to a series of continuous adverse employment actions as described herein, including denial of medical accommodations, required overtime, unwarranted performance warnings, suspension without pay, and her termination, all taken because of (but for) her age, or substantially in part because of her age.

99.    Plaintiff was always qualified for her role and was an excellent employee who performed her job duties pursuant to known internal policies and Connecticut State rules and regulations for nurses. Plaintiff made no known medication errors. Plaintiff always dispensed residents' medications properly. Plaintiff achieved all work goals given to her by her supervisors.

Plaintiff's age was a motivating factor in Defendants' decision to terminate her employment on December 9, 2021.

100.    On the many occasions that Plaintiff complained of her unlawful treatment, Defendant never provided a reason for its adverse employment actions.

101.    Upon Plaintiff's termination, Defendant never provided which "policy" Plaintiff violated, nor did it give her a specific reason for its unlawful treatment and termination of Plaintiff. Any reason Defendant now presents for the adverse actions are clearly pretextual and false.

102.    Plaintiff was denied equal treatment in the terms, conditions and privileges of her employment but for her age, and substantially in part because of her age.

103.    On information and belief, Defendant exhibited a continuous pattern of age discrimination. There was not one singular incident, but consistent and constant discriminatory acts by Defendant over a period of months.

104.    Defendant should be held liable for discriminating against Plaintiff substantially in part because of her age, in violation of the CFEPA.

**VII.    COUNT THREE:    RETALIATION BASED ON AGE DISCRIMINATION**

105.    The allegations of paragraphs 1-104 are hereby incorporated by reference the same as if fully pleaded in Count Three.

106.    Plaintiff participated in protected activity when she complained to Defendant that she was treated differently because of her age including issues related to her complaints of a hostile work environment of being overworked and Defendants' failure to hire additional nurses to work with Plaintiff, her request for medical accommodations, and ageist treatment.  Plaintiff complained to Defendant on several different occasions, for several months.

107.    After Plaintiff complained to Defendant about her unlawful treatment and hostile work

environment, and close in time to her complaints, she suffered adverse employment actions when she was suspended without pay and then fired for undefined "policy" violations.

108.    After Plaintiff complained to Defendant about her unlawful treatment, she suffered adverse employment actions when her workplace became increasingly hostile, she was suspended without pay and her employment was terminated.

109.    Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

**VIII.   COUNT FOUR:      CLAIM FOR BREACH OF IMPLIED
                           COVENANT OF GOOD FAITH AND FAIR DEALING**

110.    The allegations of paragraphs 1-109 are hereby incorporated by reference the same as if fully pleaded in Count Four.

111.    Defendant had a duty to Plaintiff to act in good faith and deal fairly with Plaintiff in the terms and conditions of her employment.

112.    Defendant acted in bad faith towards Plaintiff in the terms and conditions of her employment.

113.    No similarly situated reasonable employee would expect their employer to intentionally and willfully require her to work overtime, suffer a hostile work environment, refuse her a necessary medical accommodation, falsely accuse her of medication mistakes, and refuse to return her personal property upon her termination, and treat her this way because of her age and disability.

114.    Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

**IX.    COUNT FIVE:       INTENTIOANL INFLICTION OF EMOTIONAL DISTRESS**

115.    The allegation of paragraphs 1-114 are hereby incorporated by reference the same as if

fully pleaded in Count Five.

116.   The unlawful employment actions alleged herein were the direct result of the Defendant's actions to intentionally inflict emotional distress, or that Defendant knew or should have known that such distress was a likely result of its conduct.

117.   Plaintiff's allegations of employment discrimination and hostile work environment caused by the Defendant was so extreme and outrageous as to offend the common decency of any similarly situated individual in her position.  No employee should be subjected to a material change in their terms, conditions and privileges of employment based on her age, as alleged herein.

118.   The Defendant possessed knowledge that the employment discrimination and hostile work environment alleged herein directly violated the Defendants' own supposed employment policies, and state rules and regulations, but did nothing to remedy each and every violation.  Plaintiff has experienced severe emotional and psychological injuries as a direct and proximate cause of the Defendants' actions. She has trouble sleeping, eating, experiences stress, hair loss, high blood pressure, heart palpitations, depression and anxiety. The intentional acts of Defendants towards Plaintiff have caused her emotional distress to manifest in physical illness. She suffers chest pain, panic attacks and has been hospitalized because of her ongoing severe and emotional distress.

119.   As a result of Defendants' conduct, Plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

## X.     COUNT SIX: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA.

120.   Plaintiff repeats the allegations of Paragraphs 1 through 119, as if fully set forth herein.

121.   The Plaintiff is and was at all relevant times an individual who is disabled within the

meaning of the ADA in that she has a physical impairment that substantially limit one or more major life activities, she has a record of such impairments, and she was regarded as having such impairments by Defendants.

122.    Defendants are covered by the ADA and is subject to its mandates.

123.    At all relevant times the Plaintiff was qualified to perform the essential functions of her job as a Registered Nurse, with or without reasonable accommodation.

124.    The Plaintiff suffered adverse employment action because of her disability, plantar fasciitis, including failure to accommodate, termination, and arbitrary denial of rights afforded other non-disabled employees of Defendants.

125.    Further, the Defendants violated the ADA in that it failed to grant a reasonable accommodation of different work shoes or footwear or allowing her opportunities to sit down or get off her feet, in violation of alleged company policies, rules and regulations.

126.    The Defendants knew of the Plaintiff's disability, knew that she could perform the essential functions of her job with the reasonable accommodation of wearing different footwear/shoes and more breaks to allow her sit and relieve her foot pain, and nonetheless refused to grant the accommodation in violation of the ADA. The Defendant also failed to engage in the interactive process in any way.

127.    The adverse employment actions taken against the Plaintiff as described herein above were substantially motivated by the discriminatory animus of the Defendants, by and through its employees, based on Plaintiff's actual and perceived disabilities.

128.    Defendants cannot provide a legitimate, non-discriminatory reason for these adverse actions taken against the Plaintiff.  Any excuse proffered by Defendants is not legitimate and is merely a pretext for discrimination based on the Plaintiff's actual or perceived disability.

129.     As a direct result of the Defendants' disparate treatment, failure to accommodate, and disparate impact based on the Plaintiff's actual and perceived disabilities, the Plaintiff suffered loss of wages, loss of benefits, loss of career opportunities, damage to her reputation, loss of status, inability to locate suitable replacement employment, and emotional distress, all to her loss and damage.

130.     Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## XI.     COUNT SEVEN:     DISABILITY DISCRIMINATION IN VIOLATION OF THE CFEPA

131.     Plaintiff repeats the allegations of Paragraphs 1 through 130, as if fully set forth herein.

132.     The Plaintiff is and was at all relevant times an individual who is disabled within the meaning of the CFEPA in that she has physical impairments that substantially limit one or more major life activities, she has a record of such impairments, and she was regarded as having such impairments by Defendants.

133.     The Defendant is covered by the CFEPA and is subject to its mandates.

134.     At all relevant times the Plaintiff was qualified to perform the essential functions of her job as a Registered Nurse, with or without reasonable accommodation.

135.     The Plaintiff suffered adverse employment action because of her disability, plantar fasciitis, including failure to accommodate, termination, and arbitrary denial of rights afforded other non-disabled employees of Defendants.

136.     Further, the Defendant violated the CFEPA in that it failed to grant a reasonable accommodation of different work shoes or footwear or allowing her opportunities to sit down or get off her feet, in violation of alleged company policies, rules and regulations.

137.     The Defendant knew of the Plaintiff's disability, knew that she could perform the

essential functions of her job with the reasonable accommodation of wearing different footwear/shoes and more breaks to allow her sit and relieve her foot pain, and nonetheless refused to grant the accommodation in violation of the CFEPA. The Defendant also failed to engage in the interactive process in any way.

138.    The adverse employment actions taken against the Plaintiff as described herein above were substantially motivated by the discriminatory animus of the Defendants, by and through its employees, based on Plaintiff's actual and perceived disabilities.

139.    Defendants cannot provide a legitimate, non-discriminatory reason for these adverse actions taken against the Plaintiff.  Any excuse proffered by Defendants is not legitimate and is merely a pretext for discrimination based on the Plaintiff's actual or perceived disability.

140.    As a direct result of the Defendant's disparate treatment, failure to accommodate, and disparate impact based on the Plaintiff's actual and perceived disabilities, the Plaintiff suffered loss of wages in the form of back pay and front pay, loss of benefits, loss of career opportunities, damage to her reputation, loss of status, inability to locate suitable replacement employment, and emotional distress, all to her loss and damage.

141.    Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

**XI.    COUNT EIGHT:    CIVIL THEFT**

142.    Plaintiff repeats the allegations of Paragraphs 1 through 141, as if fully set forth herein.

143.    During Plaintiff's employment with Defendants, she kept personal items in her office at work.  Items were kept in, on and around her desk. Her personal items included, but were not limited to, black Littman stethoscope, a small silver refrigerator, personal items and office supplies in three desk drawers, her personal journal/daybook, numerous filing containers on her

desk, one functioning pulse oximeter, one lamp, and one functioning manual blood pressure cuff.

144.     In December 2021, after Plaintiff's employment was terminated, she requested to go to the Selleck's Woods facility and collect her personal property.  Defendants refused to let her collect her personal property.

145.     On December 27, 2021, Defendants attempted to return some personal items to Plaintiff via carrier. Plaintiff did not receive her black Littman stethoscope, personal items and office supplies in three desk drawers, her personal journal/daybook, her filing containers on her desk, her functioning pulse oximeter, and her functioning manual blood pressure cuff. She received her refrigerator, but it was damaged to the extent it was broken and does not work.

146.     Plaintiff notified Defendants that the refrigerator was damages, and that Plaintiff did not receive all of her personal property and detailed the amount of money the specific items cost her.

147.     Defendants did not return Plaintiff's personal property.

148.     Defendant was unauthorized to keep Plaintiff's personal property. Defendants exercised of the right of ownership over property belonging to Plaintiff and excluded Plaintiff of her property rights.

149.     Defendants intentionally withheld Plaintiff's property with the intent to permanently deprive Plaintiff her rights to her property.

150.     Defendants have control over Plaintiff's property and know that the property belongs to Plaintiff.

151.     Defendants have failed to take reasonable measures to restore the property to Plaintiff.

152.     Defendants should be held liable on this count and Plaintiff should be awarded all appropriate relief, including but not limited to treble damages.

**XII.   COUNT NINE:         VIOLATION OF CONN. GEN. STATUTE § 31-51q**

153.   Plaintiff repeats the allegations of Paragraphs 1 through 152, as if fully set forth herein.

154.   Plaintiff engaged in protected speech by complaining to Defendants, on numerous occasions, that it was violating the state rules and regulations related to assisted care facilities by having less than the required number of nursing staff ratio to residents.  Plaintiff complained that this nurse shortage placed the health and welfare of the residents at risk.

155.   Not having the required number of nurses, or medical staff, present and working at, Defendants' Selleck's Woods facility, to care for its residents, is a matter of public concern.

156.   Plaintiff was disciplined (suspended without pay and then terminated) because of, or partially because of, her multiple complaints about the need for, and requirements to have, more nursing staff.

157.   Plaintiff's protected speech did not interfere with the central purposes of the employment relationship but put Defendant on notice of its illegal activity.

158.   Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

**XIII.   COUNT TEN:         NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**

159.   Plaintiff repeats the allegations of Paragraphs 1 through 158, as if fully set forth herein.

160.   The unlawful employment actions alleged herein were the direct result of Defendants' actions to negligently inflict emotional distress on Plaintiff, and Defendants knew or should have known that such distress was a likely result of their conduct.

161.   Plaintiff repeatedly complained to her supervisors about the ongoing mistreatment such as being overworked daily, needing additional nursing staff and harassment that she was experiencing, needing accommodation for her plantar fasciitis, and being required to work

overtime, but Defendants failed to cease these unlawful acts or to remedy the situation.

162.    From the time she was unlawfully suspended without pay, and for the approximately two months thereafter while Defendants held Plaintiff in limbo, and before informing her that she was terminated, Defendants knowingly cause Plaintiff undue stress and anxiety by failing to respond to her emails and phone calls and failing to even acknowledge that she had disputed the incident leading up to her suspension. She was left not knowing the status of her employment. Defendants knew, or should have known, that this outrageous stone-walling behavior would cause Plaintiff increased and severe stress and anxiety.

163.    Defendants' acts and omissions created an unreasonable risk of harm to Plaintiff.

164.    Plaintiff has experienced severe emotional, psychological and physical injuries as a direct and proximate cause of Defendants' negligence.

165.    As a result of Defendants' negligence, Plaintiff has suffered and will continue to suffer past and future economic, physical and emotional harm.

166.    Defendant should be held liable on this count and Plaintiff should be awarded all appropriate relief.

## XIV.   PRAY FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a.    Award Plaintiff compensatory damages for age discrimination in violation of ADEA, in an amount to be determined at trial;

b.    Award Plaintiff compensatory damages for age discrimination in violation of CFEPA, in an amount to be determined at trial;

g.    Award Plaintiff treble damages for civile theft, in an amount to be determined at trial.

h.      Award Plaintiff compensatory and punitive damages for Defendant's violations of

Connecticut common law (breach of implied covenant of good faith and fair

dealing);

i.      Award Plaintiff compensatory and punitive damages for Defendant's intentional

infliction of emotional distress, in an amount to be determined at trial;

j.      Award Plaintiff compensatory damages for retaliation in an amount to be

determined at trial;

k.      Award of punitive damages;

l.      Award of prejudgment interest and costs;

m.      Award front pay damages;

n.      Award attorneys' fees and costs.

o.      Award such other relief in law or equity as this Court deems appropriate.

## **JURY TRIAL DEMANDED**

Plaintiff respectfully requests a jury trial on all questions of fact raised by her Complaint.


                                    PLAINTIFF,
                                    MARY SARA

                                    By:_____/s/_____
                                    Kirsten M. Schneider (ct27903)
                                    Carey & Associates, P.C.
                                    71 Old Post Road, Suite One
                                    Southport, CT 06490
                                    (203) 255-4150 tel.
                                    (203) 255-0380 fax.
                                    kschneider@capclaw.com
                                    Her Attorney

EXHIBIT A

EEOC Form 161-B (01/2022)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To:  **Mary Sara**<br>**35 Fairfield Avenue**<br>**Darien, CT 06820** | From:  **Boston Area Office**<br>**15 New Sudbury St, Room 475**<br>**Boston, MA 02203** |

| EEOC Charge No.<br>**523-2022-02402** | EEOC Representative<br>**ROBERT CREE,**<br>**Investigator** | Telephone No.<br>**617-865-3679** |
|---|---|---|

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court __WITHIN 90 DAYS__ of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

More than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

***Age Discrimination in Employment Act (ADEA):*** *You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court __WITHIN 90 DAYS__** \*of your receipt of this Notice.\*  Otherwise, your right to sue based on the above-numbered charge will be lost.*

***Equal Pay Act (EPA):*** *You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred __more than 2 years (3 years)__ before you file suit may not be collectible.***

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Digitally Signed By:Timothy Riera
12/15/2022

Enclosures(s)

**Timothy Riera**
**Acting District Director**

cc:  **Sara  Simeonidis**
**Jackson Lewis P.C.**
**90 STATE HOUSE SQ FL 8**
**Hartford, CT 06103**

**Kirsten M Schneider**
**Carey & Associates, P.C.**
**71 Old Post Rd, Suite One**
**Southport, CT 06890**

# EXHIBIT B

# STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

Mary Sara_____
COMPLAINANT

vs.

LCB Senior Living, LLC
d/b/a The Residence at Selleck's Wood_____
RESPONDENT

CHRO No. 2220287

EEOC No. 523-2022-02402

### RELEASE OF JURISDICTION

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action in accordance with CONN. GEN. STAT. § 46a-100 against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action brought pursuant to this release must be served on the Commission at ROJ@ct.gov or at 450 Columbus Blvd., Suite 2, Hartford, CT 06103 at the same time all other parties are served. Electronic service is preferred. **THE COMMISSION MUST BE SERVED BECAUSE IT HAS A RIGHT TO INTERVENE IN ANY ACTION BASED ON A RELEASE OF JURISDICTION PURSUANT TO CONN. GEN. STAT. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release and within two years of the date of filing the complaint with the Commission unless circumstances tolling the statute of limitations are present.

*Tanya A Hughes*
_____
Tanya A. Hughes, Executive Director

DATE: February 2, 2023
mrm

Service: **VIA EMAIL**
Complainant's Attorney: Kirsten M. Schneider, kschneider@capclaw.com
Respondent Attorney: Sara R. Simeonidis, sara.simeonidis@jacksonlewis.com